STEPHEN T. KAM (Cal. Bar No. 327576)
Email: kams@sec.gov
ROBERT C. STILLWELL (Cal. Bar No. 308630)
Email: stillwellr@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> VIVERA PHARMACEUTICALS, INC., EFT GLOBAL HOLDINGS, INC., d/b/a SENTAR PHARMACEUTICALS, and PAUL P. EDALAT, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

1. 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Edalat resides in this district, and Defendants Vivera and Sentar maintain their principal place of business within this district.

## SUMMARY

4. This action concerns a fraudulent investment scheme by defendant Vivera Pharmaceuticals, Inc. ("Vivera"), its chief executive officer defendant Paul P. Edalat, and defendant EFT Global Holdings, Inc. d/b/a Sentar Pharmaceuticals ("Sentar"), an intellectual property holding company also owned and controlled by Edalat.

5. From May 2018 until June 2020, Vivera raised about $6.6 million from approximately 63 individual investors through a private placement memorandum ("PPM") that claimed Vivera owned "an exclusive global license" to a sublingual drug-delivery technology for the pharmaceutical use of cannabidiol (CBD) or tetrahydrocannabinol (THC).

6. Vivera's PPM misled potential investors. It failed to disclose that: (1) Edalat was the controlling shareholder of both Vivera and Sentar, the ostensible licensor; (2) Edalat used his joint control of both companies to transfer new Vivera investor funds to Sentar, for the purpose of paying down a $10 million licensing fee that Edalat had previously negotiated between the two companies that he controlled;

COMPLAINT 2

(3) the purported "exclusive" intellectual property rights for which Vivera was still paying $10 million to Edalat's other company, Sentar, were not in fact exclusive or valid – Sentar had previously conveyed in January 2017 overlapping license rights to a third party, Alternate Health Corp. and Alternate Health USA Inc. (collectively, "Alternate Health"); and (4) there remained an ongoing dispute over the validity of the license that had been conveyed to Vivera due to Sentar's prior conveyance of an exclusive license to Alternate Health.

7. In fact, Vivera's represented investment opportunity – the chance to profit from the commercialization of Vivera's valuable and exclusive intellectual property rights – was illusory because those rights were neither paid for, nor were they "exclusive."

8. Vivera, Sentar, and Edalat profited from this fraudulent conduct. Between June 2018 and August 2020, Vivera paid Sentar a total of $4,510,000 in purported licensing fees, which included at least $550,000 from funds it had raised from Vivera investors. Sentar then transferred significant sums into various accounts controlled by Edalat, from which Edalat made lavish purchases, including down payments on two homes and a $425,000 luxury car.

9. By engaging in the conduct described in this Complaint, Vivera, Sentar, and Edalat violated Section 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c). In addition, Defendants Vivera and Edalat violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2); and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

10. The SEC seeks findings that the Defendants committed these violations; permanent injunctions, disgorgement with prejudgment interest, and civil penalties against all Defendants. The SEC also seeks conduct-based injunctions against Vivera and Edalat, and officer and director bars against Edalat.

**THE DEFENDANTS**

11.  **Defendant Edalat**, age 53, of Orange County, California, has been the CEO, controlling shareholder, and chairman of the board of Vivera since April 2018. During the relevant time period, Edalat was also the controlling shareholder and chairman of the board of Sentar.  In 2014, following an FDA investigation of a separate company that Edalat controlled, Edalat entered into a consent decree enjoining him from manufacturing or distributing dietary supplements.

12.  **Defendant Vivera** is a pharmaceutical company incorporated in Delaware and headquartered in Newport Beach, California.  During the relevant period, Edalat controlled Vivera.

13.  **Defendant Sentar** is an IP holding company incorporated in Nevada and headquartered in Irvine, California.  During the relevant period, Edalat controlled Sentar.

**THE ALLEGATIONS**

A.  **Sentar Conveyed an Exclusive License to Alternate Health**

14.  At all relevant times, Sentar owned the intellectual property rights to a sublingual drug delivery system (the "Technology").  The Technology consisted of tablets that could deliver substances to the body by dissolving under a person's tongue.  Edalat was the founder, controlling shareholder, and chairman of the board of Sentar.

15.  In January 2017, Sentar entered into a license agreement with Alternate Health.  Edalat signed the agreement on behalf of Sentar.  Under the agreement (the "Alternate Health Agreement"), Sentar conveyed to Alternate Health an exclusive license to make and sell CBD or THC products that used the Technology.

16.  By approximately May 2017, a dispute emerged between Sentar and Alternate Health as to the scope of the license rights that Sentar had conveyed under the Alternate Health Agreement.  In communications, Alternate Health took the position that its exclusive license included both pharmaceutical and non-

pharmaceutical products, while Edalat, on behalf of Sentar, took the position that Alternate Health's license was limited to non-pharmaceutical products.

17. For example, in a May 2017 text message exchange, an Alternate Health representative communicated to Edalat that Alternate Health's position was that its license was exclusive and covered both pharmaceutical and non-pharmaceutical products: "The contract reads 'exclusive rights to THC and CBD' . . . I need to have this confirmed in writing as it keeps being misstated . . . there cannot be competitors in the market with this!"

**B.     Sentar Also Conveyed an "Exclusive" License to Vivera**

18. Edalat formed Vivera in April 2018, more than a year after he caused Sentar to convey an exclusive license in the Technology to Alternate Health.

19. Since its formation, Edalat has been the CEO, controlling shareholder, and chairman of the board of Vivera.

20. In April 2018, Vivera entered into a license agreement with Sentar, pursuant to which Vivera purportedly acquired the exclusive right to sell pharmaceutical products that used the Technology and contained cannabinoids, such as CBD or THC (the "Vivera Agreement").

21. Edalat controlled both counterparties, Sentar and Vivera, to this purported technology transfer and used that control to engage in self-dealing. In exchange for the license, Vivera agreed to pay $10 million to Sentar. Edalat signed the Vivera Agreement on behalf of Sentar in April 2018. Then in May 2018, in his capacity as the sole member of Vivera's board of directors, Edalat signed a board resolution approving Vivera's execution of the Vivera Agreement.

22. Given Edalat's prior communications with Alternate Health's representative and his role at both Vivera and Sentar, Edalat knew that under the Vivera Agreement, Vivera was purportedly acquiring a license right that Sentar had already conveyed to Alternate Health.

23. At a minimum, Edalat knew that right – the exclusive right to sell

pharmaceutical products containing CBD or THC that used the Technology – was the subject of an ongoing disagreement with Alternate Health.

**C.     The Legal Dispute between Vivera and Alternate Health**

24.     In December 2018, Vivera filed a complaint against Alternate Health in the Superior Court of California in Los Angeles County.  In the complaint, Vivera acknowledged that Alternate Health had "claim[ed] that Vivera's business 'infringes' on [Alternate Health]'s license" and alleged that the Alternate Health Agreement was limited to non-pharmaceutical products and sought a declaratory judgment that Vivera could use the Technology for pharmaceutical products without infringing on the Alternate Health Agreement.  In May 2019, Alternate Health filed a cross-complaint seeking a declaration that it held an exclusive license to use the Technology for both pharmaceutical and non-pharmaceutical products containing CBD or THC.

25.     In April 2020, the California Superior Court issued a tentative decision ruling that the Alternate Health Agreement covered both pharmaceutical and non-pharmaceutical products containing CBD or THC that used the Technology.  In May 2020, the Court issued its final decision and entered a judgment in favor of Alternate Health.  Vivera appealed the Superior Court's judgment.  In April 2021, an appellate court affirmed the judgment.

**D.     Vivera's Securities Offering**

26.     In May 2018, just one month after the execution of the Vivera Agreement that obligated Vivera to pay Sentar $10 million, Vivera began to solicit and receive new investments through a PPM (the "May 2018 PPM").  At the time of the May 2018 PPM, Edalat was the chairman of Vivera's board of directors and was the company's controlling shareholder.  As the chairman of Vivera's board of directors, Edalat approved the board resolution adopting the May 2018 PPM.

27.     Vivera provided subsequent versions of the PPM to prospective investors dated June 2019, October 2019, January 2020, March 2020, and May 2020.

The subsequent versions of the PPM provided to investors between June 2019 and May 2020 were materially identical to the May 2018 PPM.  During this time, as the controlling shareholder and chairman of Vivera's board of directors, Edalat authorized these subsequent, materially identical, versions of the PPM to prospective investors on June 2019, October 2019, January 2020, March 2020, and May 2020.

28. From May 2018 until June 2020, Vivera raised approximately $6.6 million from approximately 63 individual investors, including 12 investors from the United States.

29. Moreover, for nearly every investment during this time period, the prospective investor submitted a signed subscription agreement that specifically referenced the PPM and in nearly every case, Edalat personally accepted the investment by signing the agreement on behalf of the company.

E.  **Vivera's Fraudulent PPM**

1.  **The PPM contained misrepresentations and omissions regarding the company's exclusive rights to the Technology**

30. Vivera's PPM highlighted its purported exclusive license to use the Technology to develop and sell pharmaceutical products containing CBD or THC.

31. For example, the PPM stated that Vivera was "primarily focused on the research and development of finished cannabinoid pharmaceutical products" and that Vivera held "an exclusive, global license to the patented, Tabmelt sublingual drug-delivery system for the pharmaceutical use of cannabinoids."

32. Vivera further represented that its path to profitability relied on its purported exclusive license to sell these pharmaceutical products.

33. These statements misrepresented that Vivera held an exclusive license to sell these pharmaceutical products, free and clear of any dispute.  The May 2018 PPM failed to disclose that the license Vivera had purportedly acquired from Sentar – the exclusive right to sell pharmaceutical products containing CBD or THC that used the Technology – was the subject of an ongoing disagreement since at least May 2017

with Alternate Health as to its scope.

34. Moreover, the subsequent versions of the PPM provided to prospective investors following the initiation of Vivera's lawsuit against Alternate Health in December 2018 failed to disclose that there was ongoing litigation as to whether Vivera could use the Technology to develop and sell pharmaceutical products containing CBD or THC.

### 2. The PPM contained misrepresentations and omissions regarding use of investor funds and Edalat's self-dealing through Sentar

35. Vivera's PPM also misrepresented how investor funds would be used. The PPM represented that investor funds would be used for expenses such as research and development, patent filings, manufacturing/distribution, and working capital.

36. The PPM, however, did not disclose that Vivera had obtained its purported license from a related party that was also controlled by Edalat (Sentar).

37. The PPM also did not disclose that the exclusive license purportedly conveyed to Vivera was not paid for – Vivera still owed $10 million to Edalat's company Sentar. Nor did the PPM disclose that Vivera would use a portion of investor funds to pay down that significant liability.

### F. Edalat and Sentar Profit from the Fraud

38. The Vivera Agreement called for Vivera to pay $10 million to Sentar "upon execution of this Agreement."

39. No such lump sum payment was made. Instead, on its balance sheet, Vivera recorded a "current liability" owed to Sentar, which Vivera gradually paid down over time.

40. Between June 2018 and August 2020, Vivera paid Sentar a total of $4,510,000 towards the licensing fee that Vivera purportedly owed to Sentar under the Vivera Agreement.

41. Vivera used at least $550,000 of the investor funds it had raised to make its payments to Sentar. Sentar transferred significant sums through and into various

other accounts controlled by Edalat, from which Edalat made lavish purchases, such as a $425,000 Ferrari, and down payments totaling more than a million dollars on two homes in Newport Beach, California.

42. In addition, Vivera made several payments to Sentar totaling $255,000 after Vivera had lost its lawsuit against Alternate Health.

43. The Superior Court issued its initial decision on April 21, 2020 that the Alternate Health Agreement covered both pharmaceutical and non-pharmaceutical products containing CBD or THC that used the Technology. Nonetheless, on April 22 and April 30, 2020, Vivera made two payments to Sentar totaling $140,000.

44. In May 2020, the Superior Court entered a judgment in favor of Alternate Health. Nonetheless, between June and August 2020, Vivera made three further payments to Sentar totaling $115,000.

**G.    The Fraud was Material**

45. Defendants' misrepresentation that Vivera held "an exclusive global license" to commercially develop the Technology in pharmaceutical products containing CBD or THC would be significant information to an objectively reasonable investor because the undisclosed truth – that Vivera's license rights were not what defendants had represented – concerned the fundamental reason as to why investors participated in the Vivera offering, *i.e.*, that Vivera's path to profitability depended on its commercialization of the represented intellectual property rights.

46. Defendants' failure to disclose that there was litigation over the scope of Vivera's license rights beginning in December 2018 is also significant information to an objectively reasonable investor because Vivera's commercial success depended on its ownership of an exclusive license to commercially develop the Technology in pharmaceutical products containing CBD or THC and because existing litigation about the validity of those rights placed any commercial success in significant doubt.

47. Defendants' failure to disclose the related-party nature of the Vivera Agreement, the fact that Vivera owed $10 million to the licensor of the Technology, a

company also controlled by Edalat, would further be significant information to an objectively reasonable investor because those undisclosed facts show that Vivera's touted intellectual property interest was not in fact paid for, and moreover that investor funds would be diverted away from Vivera's research and development, patent filings, manufacturing/distribution, and working capital.

**H.     Vivera, Edalat, and Sentar Acted with Scienter and Their Conduct was Negligent**

48.     Edalat acted with scienter.  No later than May 2017, he knew that Alternate Health had asserted an exclusive license right over CBD or THC products that used the Technology.

49.     Accordingly, in April 2018, when Edalat entered into the Vivera Agreement on behalf of Sentar; and, in May 2018, when Edalat approved Vivera's execution of the Vivera Agreement, Edalat knew, or was reckless in not knowing, that there was a risk that Vivera had purportedly acquired license rights which already belonged to Alternate Health.

50.     Edalat's approval of Vivera's PPM in May 2018 was, at a minimum, reckless, because the PPM failed to specifically disclose a significant, known risk to the viability of Vivera's purported license rights.

51.     In addition, in December 2018, Vivera filed its lawsuit against Alternate Health.  Even thereafter, Edalat signed numerous further subscription agreements and accepted millions in further investments in Vivera.  However, Edalat recklessly or intentionally failed to ensure that the PPMs used to solicit those further investments adequately disclosed that the validity of the license rights conveyed under the Vivera Agreement were the subject of litigation.

52.     Last, Vivera made three further payments to Sentar after the Superior Court entered judgment in May 2020 finding that Alternate Health's prior license covered pharmaceutical products containing CBD or THC that used the Technology.

53.     Edalat also acted with scienter because, given that he controlled both

Sentar and Vivera, he knew that investor funds would immediately start flowing to him through Sentar.

54.  Edalat's conduct in connection with the Vivera securities offering, the self-dealing negotiation and execution of the purported exclusive license agreement between Vivera and Sentar, companies that he both controlled, and his failure to disclose his affiliation with Sentar, Vivera's licensor, or the prior conveyance of a license to Alternate Health and the ensuing litigation, was unreasonable, and by engaging in that conduct, Edalat acted negligently.

55.  Because at all relevant times he was both entities' controlling shareholder and chairman of the board, Edalat's scienter and negligence with respect to his actions on behalf of Sentar and Vivera can be imputed to Sentar and Vivera, respectively.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Vivera and Edalat)**

56.  The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

57.  When raising approximately $6.6 million from dozens of investors from May 2018 to June 2020, Vivera and Edalat solicited investors with a PPM that claimed Vivera had an exclusive global license to a sublingual drug-delivery technology for the pharmaceutical use of CBD or THC.  Vivera and Edalat defrauded investors.  They failed to disclose that: (i) Edalat controlled Sentar, the licensor; (ii) Vivera did not have an exclusive license since Edalat had previously used his control of Sentar to license the Technology to Alternate Health in January 2017; (iii) there was an ongoing dispute between Alternate Health and Sentar over Alternate Health's own exclusive right to the Technology, a dispute that was eventually resolved in Alternate Health's favor; and most significantly, (iv) even though the Vivera PPM

stated that the company possessed an exclusive license, Edalat's company, Vivera, in fact owed $10 million to Edalat's other company, Sentar, and after causing Vivera to enter into the Vivera licensing agreement, Edalat and Vivera used a significant portion of investor funds raised to pay Sentar, which ultimately was transferred to Edalat.  In sum, Vivera's represented investment opportunity – a return on the commercialization of Vivera's valuable and exclusive intellectual property rights – was false because those rights were neither paid for, nor were they "exclusive," as the rights had already been conveyed to Alternate Health.

58.  By engaging in the conduct described above, Defendants Vivera and Edalat, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

59.  Defendants Vivera and Edalat, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

60.  By engaging in the conduct described above, Defendants Vivera and Edalat violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Vivera and Edalat)

61. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

62. When raising approximately $6.6 million from dozens of investors from May 2018 to June 2020, Vivera and Edalat solicited investors with a PPM that claimed Vivera had an exclusive global license to a sublingual drug-delivery technology for the pharmaceutical use of CBD or THC. Vivera and Edalat defrauded investors. They failed to disclose that: (i) Edalat controlled Sentar, the licensor; (ii) Vivera did not have an exclusive license since Edalat had previously used his control of Sentar to license the Technology to Alternate Health in January 2017; (iii) there was an ongoing dispute between Alternate Health and Sentar over Alternate Health's own exclusive right to the Technology, a dispute that was eventually resolved in Alternate Health's favor; and most significantly, (iv) even though the Vivera PPM stated that the company possessed an exclusive license, Edalat's company, Vivera, in fact owed $10 million to Edalat's other company, Sentar, and after causing Vivera to enter into the Vivera licensing agreement, Edalat and Vivera used a significant portion of investor funds raised to pay Sentar, which ultimately was transferred to Edalat. In sum, Vivera's represented investment opportunity – a return on the commercialization of Vivera's valuable and exclusive intellectual property rights – was false because those rights were neither paid for, nor were they "exclusive," as the rights had already been conveyed to Alternate Health.

63. By engaging in the conduct described above, Defendants Vivera and Edalat, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices,

schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

64. Defendants Vivera and Edalat, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

65. By engaging in the conduct described above, Defendants Vivera and Edalat violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendant Sentar)**

66. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

67. In April 2018, Edalat entered into the Vivera Agreement on behalf of Sentar. In May 2018, in his capacity as the sole member of Vivera's board, Edalat approved Vivera's execution of the Vivera Agreement and also authorized and approved Vivera's PPM, which contained the misrepresentations and omissions set forth above. With these actions, Sentar, Edalat, and Vivera jointly created the false appearance of fact that Vivera held an exclusive license to sell pharmaceutical

products that used the Technology and that contained CBD or THC, free of any dispute as to whether Vivera could legally monetize those rights. Further, Edalat used Vivera's agreement with Sentar as a mechanism to appropriate investor funds. Rather than transferring funds directly to Edalat, Vivera made payments to Sentar, which then sent funds to a variety of entities and accounts controlled by Edalat.

68. By engaging in the conduct described above, Defendant Sentar, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

69. Defendant Sentar, with scienter, employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

70. By engaging in the conduct described above, Defendant Sentar violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against Defendant Sentar)**

71. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

72. In April 2018, Edalat entered into the Vivera Agreement on behalf of Sentar. In May 2018, in his capacity as the sole member of Vivera's board, Edalat approved Vivera's execution of the Vivera Agreement, and also authorized and approved Vivera's PPM, which contained the misrepresentations and omissions set

forth above. With these actions, Sentar, Edalat, and Vivera jointly created the false appearance of fact that Vivera held an exclusive license to sell pharmaceutical products that used the Technology and that contained CBD or THC, free of any dispute as to whether Vivera could legally monetize those rights. Further, Edalat used Vivera's agreement with Sentar as a mechanism to appropriate investor funds. Rather than transferring funds directly to Edalat, Vivera made payments to Sentar, which then sent funds to a variety of entities and accounts controlled by Edalat.

73. By engaging in the conduct described above, Defendant Sentar, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

74. Defendant Sentar, with scienter, employed devices, schemes and artifices to defraud; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

75. By engaging in the conduct described above, Defendant Sentar violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Vivera, Edalat, and Sentar, and

their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 2l(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Defendant Edalat from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

### IV.

Enter an order permanently enjoining Defendants Vivera and Edalat from participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by either or both of them, in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Edalat from purchasing or selling securities for their own personal account.

### V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 30, 2022

/s/ *Stephen T. Kam*
Stephen T. Kam
Robert C. Stillwell
Attorneys for Plaintiff
Securities and Exchange Commission