STEPHEN T. KAM (Cal. Bar No. 327576)
Email: kams@sec.gov
ROBERT C. STILLWELL (Cal. Bar No. 308630)
Email: stillwellr@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brent W. Wilner, Associate Director
Stephen Kam, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>VIVERA PHARMACEUTICALS, INC., EFT GLOBAL HOLDINGS, INC., d/b/a SENTAR PHARMACEUTICALS, and PAUL P. EDALAT,<br><br>Defendants. | Case No. 8:22-cv-01792-FWS-DFM<br><br>**DECLARATION OF GREGGORY PEAT IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES AND ENTRY OF FINAL JUDGMENTs AGAINST DEFENDANTS VIVERA PHARMACEUTICALS, INC., EFT GLOBAL HOLDINGS, INC., d/b/a SENTAR PHARMACEUTICALS, AND PAUL P. EDALAT**<br><br>Date:      May 21, 2026<br>Time:      10:00 am<br>Ctrm:      Santa Ana, 10D<br>Judge:     Hon. Fred W. Slaughter |

## **DECLARATION OF GREGGORY PEAT**

I, Greggory Peat, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Senior Managing Director in the Forensic & Litigation Consulting segment of FTI Consulting, Inc. ("FTI").  I have a Bachelor of Science degree ("BS") in Accountancy and a BS in Finance and hold the following certifications: Certified Public Accountant ("CPA"), Certified in Financial Forensics ("CFF"), and Accredited in Business Valuation ("ABV").  I am a member of the American Institute of Certified Public Accountants ("AICPA") and am an AICPA Forensic and Valuation Services Section Member.  I specialize in forensic accounting and investigations including investigations involving alleged accounting and financial reporting fraud and misappropriation of assets.  I also serve as a forensic accounting expert in dispute matters primarily involving accounting, economic, and financial analyses of claims and damages.

2.      I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

## **ASSIGNMENT**

3.      The U.S. Securities and Exchange Commission ("SEC") retained me to analyze financial records and other case materials and to provide opinions in connection with a complaint filed by the SEC in this action against Vivera Pharmaceuticals, Inc. ("Vivera"), Paul P. Edalat ("Edalat"), and EFT Global Holdings, Inc., d/b/a Sentar Pharmaceuticals ("Sentar").  I prepared an expert report dated May 27, 2024, setting forth my opinions and the bases for those opinions in this matter ("Expert Report").  My Expert Report and my CV were submitted in support of the SEC's Motion for Summary Judgment at Dkt. No. 59 (Exhibit 37).

4.      As set forth in my Expert Report, I was asked to provide opinions regarding the amount of investor proceeds raised through the sale of Vivera securities during the period from May 1, 2018 through June 30, 2020 ("Investor Proceeds").  I

1

was also asked to provide opinions regarding the amount of Investor Proceeds used by Vivera and/or Edalat to pay Sentar for purported licensing fees during the period from June 1, 2018 through August 31, 2020 and to pay for personal housing and automobile-related purchases during the period from May 1, 2018 through August 31, 2020.

5.     The SEC asked me to summarize certain of the analyses I performed and opinions I expressed in my Expert Report and provide other information within my knowledge based on the same.  The SEC also asked me to identify and quantify the amount of money Vivera maintained in the bank accounts that were the subject of my analyses as of August 31, 2020.

6.     I charge $850 per hour for all work and testimony in this matter.  My compensation is not contingent on the opinions I offer or the outcome of this case.

## **MATERIALS REVIEWED**

7.     I reviewed, in summary, the following documents in reaching my conclusions set forth in my Expert Report and summarized in this declaration:

a.     Private placement offering memoranda used by Vivera to offer and sell securities in the form of Vivera shares;

b.     A listing of investors produced by Vivera which included investments received during the period from May 1, 2018 through June 30, 2020 (the "Vivera Investor Listing");

c.     Bank records related to twenty (20) bank accounts that included thirteen (13) Vivera bank accounts, two (2) Sentar accounts, two (2) of Edalat's personal accounts, and three (3) accounts used by other entities controlled by Edalat (all together, the "Bank Accounts," such records the "Bank Records") covering the period from April 1, 2018 through August 31, 2020; and

d.     Vivera's general ledger accounting and other financial records.

2

8.    For a complete listing of documents relied upon and additional detail, evidence cited, and analyses that support the conclusions set forth in this declaration, reference should be made to my Expert Report.

## EDALAT CONTROLLED BOTH VIVERA AND SENTAR

9.    Edalat was the chief executive officer ("CEO"), controlling shareholder, and chairman of the board of Vivera since April 2018.  During the period relevant to the opinions expressed in my Expert Report, Edalat controlled Vivera.  For example, Vivera's Private Placement Memorandum ("PPM") dated April 27, 2018 (the "April 2018 PPM"), which was used to solicit and receive investor proceeds disclosed that Edalat, as an individual, owned 65% of Vivera's then outstanding common stock.  Edalat was also the signatory on behalf of Vivera for the offering's subscription agreement.  Based on the Bank Records that I reviewed in preparing my Expert Report, I observed that account opening forms for at least two (2) of the thirteen (13) Vivera Bank Accounts were signed by Edalat as CEO and list Edalat as an authorized signer.  I also observed Edalat's signature on check copies for certain of the other eleven (11) Vivera Bank Accounts.

10.    The April 2018 PPM also disclosed that Sentar, an intellectual property ("IP") holding company owned an additional 20% of Vivera's then outstanding common stock.  Sentar owned the IP rights to a sublingual drug delivery system that consisted of tablets that could purportedly deliver substances to the body by dissolving under a person's tongue (the "Technology").  Edalat also controlled Sentar.  For example, drafts of Vivera's preliminary prospectuses dated in March 2019 prepared in connection with an unsuccessful initial public offering stated that Edalat was the founder and controlling shareholder of Sentar.  Edalat also signed a license agreement (the "Alternate Health License") on behalf of Sentar, under which Sentar conveyed to Alternate Health Corp. and Alternate Health USA Inc. (collectively, "Alternate Health") an exclusive license to the Technology.  On April 19, 2018, Vivera entered into a license agreement with Sentar (the "Vivera License

3

Agreement"), pursuant to which Vivera purportedly acquired the exclusive right to sell pharmaceutical products that used the Technology and contained cannabinoids, such as cannabidiol ("CBD") and tetrahydrocannabinol ("THC") (the "Vivera License"). Edalat signed the Vivera License Agreement on behalf of Sentar in April 2018. In May 2018, in his capacity as the sole member of Vivera's board of directors, Edalat signed a board resolution approving Vivera's execution of the Vivera License Agreement. Based on the Bank Records that I reviewed in preparing my Expert Report, I observed Edalat's signature on check copies for each of the two (2) Sentar Bank Accounts.

## VIVERA'S OFFERING DOCUMENTS DID NOT DISCLOSE THE DISPUTE WITH ALTERNATE HEALTH REGARDING THE TECHNOLOGY OR THAT INVESTOR PROCEEDS WOULD BE USED TO PAY SENTAR TO USE THE TECHNOLOGY

11.    In May 2018, Vivera began to solicit and receive new investments through the April 2018 PPM. The April 2018 PPM represented that Vivera held an exclusive license to use the Technology. Specifically, the PPM stated that Vivera was "primarily focused on the research and development of finished cannabinoid pharmaceutical products" and that Vivera held "an exclusive, global license to the patented, Tabmelt sublingual drug-delivery system for the pharmaceutical use of cannabinoids." The April 2018 PPM summary described Vivera's business plan, which relied on its purported exclusive license to sell these pharmaceutical products.

12.    The April 2018 PPM represented that investor proceeds would only be used for "Product development, continued and new patent filings, IPO expenses, and working capital." The April 2018 PPM did not disclose that the purportedly "exclusive" license rights that Vivera had acquired from Sentar to sell pharmaceutical products that used the Technology and that contained cannabinoids were the subject of an ongoing disagreement since at least May 2017 with Alternate Health as to the

4

scope of the Alternate Health License.  The April 2018 PPM also did not disclose that Vivera owed an up-front fee of $10 million to Sentar, a related party, for the Vivera License or that Vivera would use investor funds to pay down this liability.

13.    Vivera provided subsequent versions of the PPM to prospective investors dated June 2019, October 2019, December 2019, January 2020, March 2020, and May 2020 (the "June 2019 to May 2020 PPMs," together with the April 2018 PPM, the "Offering Documents").  The June 2019 to May 2020 PPMs disclosed additional uses for Investor Proceeds, which included, among other things, equipment and lab facility expansion, manufacturing, distribution and completing clinicals.  The June 2019 to May 2020 PPMs were similar in substance to the April 2018 PPM and (i) represented that Vivera held an "exclusive" license to use the Technology to develop and sell pharmaceutical products containing cannabinoids, such as CBD and THC, (ii) did not disclose the dispute with Alternate Health regarding the scope of the Alternate Health License or how the dispute had progressed into a formal legal action pending in California state court, and (iii) did not disclose the amount owed to Sentar for the Vivera License or that investor funds would be and were used to pay down at least a portion of this liability.

## VIVERA AND EDALAT RAISED $6,731,768 FROM INVESTORS THROUGH THE SALE OF VIVERA SECURITIES DURING THE PERIOD FROM MAY 2018 THROUGH JUNE 2020

14.    To identify and quantify the amount of investor proceeds raised through the sale of Vivera securities during the period from May 1, 2018 through June 30, 2020, I reviewed a listing of investors produced by Vivera which included investments received during the same period (the Vivera Investor Listing).  I used the details (*e.g.*, investor name, investment date, investment amount, *etc.*) of the investments received as reflected in the Vivera Investor Listing to compare against the Bank Records underlying the Bank Accounts subject to the scope of my review.

Based on this comparison, I was able to identify and quantify $6,731,768 of funds received by Vivera in Vivera's underlying Bank Records during the period from May 2018 through June 2020.

15.    Based on my analyses of the financial records and other case materials summarized above, I concluded that Vivera raised $6,731,768 in Investor Proceeds during the period from May 1, 2018 through June 30, 2020.

## AT LEAST APPROXIMATELY $2,137,309 OF INVESTOR PROCEEDS WERE NOT USED FOR LEGITIMATE BUSINESS PURPOSES AS DESCRIBED IN VIVERA'S OFFERING DOCUMENTS

16.    The Offering Documents disclosed that Investor Proceeds would be used for various purposes.  Such purposes included, among other things, product development, continued and new patent filings, equipment and lab facility expansion, manufacturing, distribution, completing clinicals, IPO expenses, and working capital. The Offering Documents did not disclose that Vivera owed as much as $10 million to Sentar, a related party, for the Vivera License or that Vivera would use investor funds to pay down this liability.  The Offering Documents also did not disclose that Investor Proceeds would be used for something other than legitimate business purposes.

17.    As set forth in my Expert Report, I was asked to provide opinions regarding the amount of Investor Proceeds used to pay Sentar for purported licensing fees during the period from June 1, 2018 through August 31, 2020 and for personal housing and automobile-related purchases during the period from May 1, 2018 through August 31, 2020.  Investor Proceeds received by Vivera were commingled with funds received from other sources.  Because cash is fungible, a tracing method is required to determine amounts spent for certain purposes that were funded by Investor Proceeds.  I applied the Lowest Intermediate Balance Rule ("LIBR") tracing method in this case to determine the amount of Investor Proceeds that were used for

6

certain purposes. The LIBR tracing method generally results in a more conservative (*i.e.*, defendant-friendly) quantification of specific funds used for a given purpose relative to other tracing methods. Under the LIBR method, as applied here, Investor Proceeds remain in the relevant Bank Accounts until all non-Investor Proceeds are disbursed from each relevant Bank Account. For example, non-Investor Proceeds deposited into a bank account under the LIBR tracing method will sit on top of the Investor Proceeds and will be used first for disbursements, until such non-Investor Proceeds are used up, at which point the pool of Investor Proceeds remaining in the bank account are used to fund disbursements. My detailed application of the LIBR tracing method in this matter was appended to my Expert Report as **Exhibit 5.1** to **Exhibit 5.5, Exhibit 6** and **Exhibit 8**.

18. To determine the amount of Investor Proceeds used to pay Sentar for purported licensing fees, I first identified and quantified the total amount of payments from Vivera to Sentar for purported licensing fees. Based on my analysis of the Bank Records underlying the Bank Accounts subject to my review, as well as Vivera's general ledger accounting records, I identified and determined that forty (40) payments totaling $4,510,000 were made by Vivera to Sentar for purported licensing fees during the period from June 1, 2018 through August 31, 2020.

19. To determine the amount of Investor Proceeds used for purported licensing fees under the LIBR tracing method, I first identified the flow of funds starting with the Investor Proceeds received by Vivera and ending in either of the two Sentar Bank Accounts. I found that the "pathway" of the Investor Proceeds used by Vivera to pay Sentar for purported licensing fees could have included four Bank Accounts. I then applied the LIBR tracing method to the four relevant Bank Accounts. Based on my application of the LIBR tracing method to the four relevant Bank Accounts, I determined that $1,808,696 of Investor Proceeds were used to fund payments for purported licensing fees.

20. In analyzing the information within the Bank Records, I also observed a

number of transactions which, based on their description and recipient as reflected in the Bank Records, were not for legitimate business purposes as described in the Offering Documents. Such purchases were for personal housing and automobile-related goods or services, including down payments on multiple houses and purchases of multiple luxury or exotic automobiles. I analyzed the personal housing and automobile-related purchases to determine to what extent these purchases were funded by Investor Proceeds. Specifically, in connection with the tracing of Investor Proceeds used to fund purported licensing fees using the LIBR tracing method, I determined that $328,613 of Investor Proceeds were used to fund six (6) housing or automobile-related purchases during the period from May 1, 2018 through August 31, 2020.

21. Based on my review and analyses, I found that approximately $2,137,309 of Investor Proceeds were not used for legitimate business purposes as described in Vivera's Offering Documents, which included Investor Proceeds used to pay Sentar for purported licensing fees ($1,808,696) and for personal purchases ($328,613). Based on my application of the LIBR tracing method, and the detail in **Exhibit 5.1** of my Expert Report, the other $4,594,459 of Investor Proceeds was used for various other purposes such as payroll, legal expenses, office space or rent expense, travel (*e.g.*, flights, taxi, hotel, meals), and taxes; $104,028 of Investor Proceeds were unused (*i.e.*, remained in Vivera Bank Accounts) as of August 31, 2020, the end of the period subject to my analysis.

## VIVERA HELD APPROXIMATELY $208,092 AS OF AUGUST 31, 2020

22. To identify and quantify the amount of money Vivera maintained as of August 31, 2020, I reviewed the Bank Records underlying the thirteen (13) Vivera Bank Accounts that were the subject of the analyses described in my Expert Report. For each of the Vivera Bank Accounts and using the Bank Records, I was able to identify (i) the cash balance as of August 31, 2020, (ii) the balance as of the date of the most recent transaction nearest to and preceding August 31, 2020, or (iii) the

8

balance as of the date the account was closed if such closure occurred on or before August 31, 2020.  I determined that the total amount of money held in the Vivera Bank Accounts was $208,091.74 as of August 31, 2020.  The following table summarizes the account balances of the Vivera Bank Accounts as of August 31, 2020.

**Table 1**

| Act. No. | Bank | Balance at August 31, 2020 | Ref. |
|---|---|---|---|
| *6803 | Federal Republic Bank | 39,960.00 | SEC-FRB-E-0000414 [1] |
| *7908 | U.S. Bank | - | SEC-USBANK-E-0000003 |
| *9259 | U.S. Bank | - | SEC-USBANK-E-0000680 |
| *4955 | Wells Fargo Bank | 39,189.68 | SEC-WFB-E-0002298 |
| *4963 | Wells Fargo Bank | 47,665.89 | SEC-WFB-E-0002343 |
| *1543 | Partners Bank of California | 67,321.82 | SEC-PBOCA-E-0000040 |
| *1551 | Partners Bank of California | 10,958.00 | SEC-PBOCA-E-0000046 |
| *1569 | Partners Bank of California | 446.15 | SEC-PBOCA-E-0000053 |
| *1820 | Partners Bank of California | 2,450.20 | SEC-PBOCA-E-0000059 |
| *3367 | Partners Bank of California | 100.00 | SEC-PBOCA-E-0000067 |
| *5373 | Bank of the West Paribas | - | SEC-BOTW-E-0000001 |
| *5613 | Bank of the West Paribas | - | SEC-BOTW-E-0000001 |
| *8375 | Bank of Southern California | - | SEC-BOSC-E-0000031 |
| | **Total** | **$208,091.74** | |

[1] The August 2020 bank statement for this account was produced in Excel format, with no running balance presented.  The amount presented in Table 1, above, is based on the running balance I calculated for this account as of August 31, 2020, at **Exhibit 5.2** of my Expert Report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of April, 2026 in Lake Oswego, Oregon.

_____

Greggory Peat, CPA, CFF, ABV

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On April 20, 2026, I caused to be served the document entitled **DECLARATION OF GREGGORY PEAT IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR REMEDIES AND ENTRY OF FINAL JUDGMENTS AGAINST DEFENDANTS VIVERA PHARMACEUTICALS, INC., EFT GLOBAL HOLDINGS, INC., d/b/a SENTAR PHARMACEUTICALS, AND PAUL P. EDALAT** on all the parties to this action addressed as stated on the attached service list:

☐  **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐  **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐  **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐  **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐  **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐  **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒  **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐  **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  April 20, 2026                    /s/ Stephen Kam

                                             Stephen Kam

11

*SEC v. Vivera Pharmaceuticals, Inc., et al*
**United States District Court—Central District of California**
**Case No. 8:22-cv-01792-FWS-DFM**

## SERVICE LIST

John A. Sten, Esq. **(served by CM/ECF)**
Byrd Campbell, P.A.
75 Arlington Street, Suite 500
Boston, MA 02116
Email:  jsten@byrdcampbell.com
*Attorney for Defendant Vivera Pharmaceuticals, Inc.*


Saied Kashani, Esq. **(served by CM/ECF)**
800 W. 1st Street, Suite 400
Los Angeles, CA 90012
Email:  saiedkashani@gmail.com; saiedkashani@googlemail.com
*Attorney for Defendants Vivera Pharmaceuticals, Inc., EFT Global Holdings, Inc., d/b/a Sentar Pharmaceuticals and Paul P. Edalat*